JUDGE SWAIN

11 CIV 0752

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRAVIS TRITT,

                Plaintiff,

vs.

CATEGORY 5 RECORDS, LLC
and RAYMOND TERMINI,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**COMPLAINT**

**Case No. 10 CV _____**

**Trial Jury Demanded**

RECEIVED FEB 03 2011 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff, Travis Tritt ("Tritt"), by his counsel, Wuersch & Gering LLP, files this Complaint against Defendants, Category 5 Records, LLC ("Category 5") and Raymond Termini ("Termini"), alleging the following:

## PRELIMINARY STATEMENT

Travis Tritt is a well known artist and musician who entered into a December 24, 2005 Independent Record Label Recording and Personal Services Agreement with a Connecticut limited liability company, Category 5 (the "Agreement"), whereby Category 5 contracted to produce, release, and promote on an independent label a new Tritt album, titled "The Storm." Category 5 misrepresented its ability to competently produce and finance "The Storm," and failed to honor the contract, resulting in various material breaches that have harmed Tritt as a musician, and harmed sales of "The Storm." But even more damaging to Tritt and his reputation was that Category 5 and its president, Defendant Termini, engaged in fraud to dupe Tritt out of hundreds of thousands of dollars, all at the cost of delaying the release and promotion of "The Storm" and depriving Tritt's fans of his music. Termini's goal was to introduce a popular artist of Tritt's caliber to his new label, which was funded through misappropriated payments due to a health care facility to which Termini served as CEO, in order to attract other new artists to

Category 5 to develop an independent label that existed to legitimize Termini's fraud. When Termini's fraud at his health care facility was revealed, Category 5 came crashing down, and Termini pled guilty to several felony counts and went to prison. At the same time, Tritt was defrauded out of hundreds of thousands of dollars, and is owed even more by Termini and Category 5 in the form of unreimbursed expenses and unpaid royalties.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. The amount in controversy is in excess of $75,000, exclusive of interest and costs.

2. Venue is proper in this district because the parties consented to venue in this District under the Agreement.

3. The parties consented to the exclusive jurisdiction of New York state or federal courts to resolve any action or proceeding arising out of their business relationship and contract.

## THE PARTIES

4. Plaintiff Tritt is a citizen of the state of Georgia. Tritt is a world known and respected singer, performer, and recording artist, selling more than twenty-five million recorded albums during his career, and having been recognized with two Grammy awards and three Country Music Association awards.

5. Defendant Category 5 is a Connecticut limited liability corporation which formerly engaged in business operations in Nashville, Tennessee. Category 5 was an independent audio music record company that was established by Defendant Termini in late 2005. Category 5 may have at times conducted business as Category 5 Music, LLC.

6. At all relevant times, Termini was a citizen of the state of Connecticut. At all relevant times, Termini was the President and CEO of Category 5. Upon information and belief, Termini is a prisoner at the Federal Correctional Institution in Fort Dix, New Jersey.

## FACTS

7. Termini started Category 5 in 2005 as an independent record company, the purported and publicly announced business purpose of which was to solicit from musical recording artists, such as Tritt, their talents and skills for the economic benefit of Category 5 and Termini.

8. While unknown to Tritt at the time, Termini actually created Category 5 to defraud music artists, signing them to personal service contracts to gain valuable master recordings and intellectual property rights to songs, while at the same time failing to properly promote the artist or music, undertaking as little contractual or practical effort as possible, while failing to take basic steps to advance the career and music sales of its artists.

9. Category 5 followed the usual business plan of independent labels, advancing funds to produce, distribute, and sell recorded works of artists under the promise that the sales of such works would be more financially lucrative to the artist because of the personal approach of a private, independent label rather than an impersonal large label that retained more profits from sales of the artist's material.

10. Category 5 acknowledged to Tritt and his representatives that the role and performance of a record company, its financial strength and its skill and abilities, are critical to the professional success of an artist such as Tritt. Termini boasted of these attributes of Category 5, but unknown to Tritt, Category 5 was being financed through a fraudulent scheme orchestrated by Termini to convert Medicare and Medicaid funds from a health care company to whom he served as CEO.

11. Beginning in November 2005, Termini approached Tritt and his management to persuade Tritt to agree to a recording agreement with Category 5.

12. Unknown to Tritt and his management team, Termini fraudulently or negligently misrepresented Termini and Category 5's skills and ability to perform under a recording agreement.

13. Termini falsely mischaracterized and misrepresented his experience, business acumen, financial support, and stability to sustain a business in the professional recording industry.

14. Termini and Category 5 further misrepresented Category 5's ability to operate and survive in an industry that required particular attention to artists and the trade, and over-stated Category 5's financial ability to render services under a recording contract.

15. Termini and Category 5 misrepresented Category 5's economic ability to honor long term obligations under a recording contract. Termini personally misrepresented his skill and competence as a record company executive and overstated his industry knowledge and relevant experience.

16. Termini also misrepresented his financial skills and resources; the abilities of Termini and his professional promotion and advertising personnel; his willingness and desire to permit Tritt and his representatives to provide creative input, marketing, and promotional influence for Tritt's records; and Termini and Category 5's ability to honor his and its financial obligations to Tritt under a contemplated recording agreement.

17. During initial Termini conferences with Tritt's representatives, and in furtherance of Termini's solicitation of Tritt as a Category 5 signed artist, Termini also told Tritt and his management that the operation of Category 5 would be fully staffed; would be very

competitive in the market place; would have sufficient resources to run the record label and promote the records, and *"that he would do business like no other label in town."*

18. Termini falsely informed Tritt and his management team that Category 5 would construct a label around Tritt, and would not sign any other music recording artists to Category 5 without prior consultation with, and approval of, Tritt and his management team. This representation was made to induce Tritt to sign with Category 5.

19. The representations by Termini about Category 5 and his background were material to Tritt but were false and misleading when made. Termini made such misrepresentations in order to induce Tritt to enter into the Agreement.

20. Tritt informed Termini that he was interested in joining a record label that would provide him with the creative and marketing input that Termini promised and Tritt desired. Tritt also informed Termini that it was important for the record label to continue to build Tritt's standing and reputation as a recording artist, including arranging for top-level record production and other promotional efforts aimed at selling records and providing exposure to Tritt as a well-known artist.

21. Termini met with Tritt and his manager in December 2005, and Termini assured them that if Tritt signed as an artist with Category 5, Tritt would have complete creative control and could record whatever type of album he wanted.

22. Tritt was interested in Category 5 but was concerned that it was a start-up independent record label without a historic track record of success or experience. Thus, Tritt requested proprietary financial and other information from Termini.

23. Termini informed Tritt and his manager that not only would they have control over the album, but the record company would be financially sound and exist for the benefit of Tritt. Unknown to Tritt and his management team, the financial documents furnished

to Tritt after Tritt executed a confidentiality agreement, which Tritt relied upon to his determent, were based upon converted funds from another business fraudulently operated by Termini.

24. Termini indicated that he was a man of substantial means and wealth. In fact, Termini represented orally at the outset of the discussions that a benefit to Tritt in signing a recording agreement with Category 5 was that the needed funding to perform Category 5's obligations was available.

25. Termini further represented as an inducement to Tritt that Category 5 was financially sound, and since Termini was independently wealthy and would fund Category 5, there would be no committee structure required to operate Category 5.

26. Termini also represented that he and Category 5 had the means and desire to effectively promote Tritt's records and market Tritt as an artist, including funding appearances and other promotional activities.

27. Reasonably relying on these assurances and information from Termini, on December 24, 2005, Tritt entered into the Agreement with Category 5, a copy of which is annexed as Ex. 1.

28. Under the Agreement, Tritt was to provide his exclusive personal services as a recording and performance artist to Category 5 for one year with three separate consecutive one-year options, with a minimum recording commitment of at least one album per contract year, in exchange for certain advances and royalties.

29. The Agreement further provided that Category 5 would reimburse Tritt for reasonable travel and living expenses related to promotional activities, and would provide charter jet services for Tritt's use during tours conducted in the United States during 2006 and 2007.

30. At the time Tritt executed the Agreement, Tritt was not aware that the representations made to induce Tritt to enter into a recording deal with Category 5 were

materially false and misleading, and that Category 5 had no real means to deliver upon the promises of Termini and the expectations under the Agreement.

31. Termini's promises were intended to induce Tritt to sign a multi-album recording agreement with Category 5. Ultimately, despite due diligence by Tritt which failed to uncover the fraudulent intentions of Termini because they were disguised and masked in the information produced to Tritt, it turns out that Termini was a fraud.

32. Almost immediately after Tritt executed the Agreement, Category 5, contrary to the expectations of Tritt and the representations of Termini, signed other artists without involving Tritt or first obtaining his consent.

33. Tritt objected to adding additional artists to the label roster because Tritt was concerned that resources dedicated to his album would be depleted, and that Termini would not contribute to Tritt's album the requisite attention and dedication that Termini had promised in order to induce Tritt to sign with Category 5.

34. Even though questioned by Tritt's representatives after new artists were signed to Category 5, Termini insisted that he had plenty of resources to adequately record, promote, and market Tritt's album.

35. Following execution of the Agreement, Tritt and a producer, Randy Jackson, co-produced Tritt's much-anticipated album on Category 5 titled "The Storm."

36. While "The Storm" was being completed and launched to the market, Termini failed to follow the direction and guidance of Tritt and his experienced team, interrupting and interfering with the technical production of the recording, including but not limited to the "mixing" of the album and re-touching of the album cover art.

37. Category 5 misspent needed advertising and promotional money for "The Storm," mismanaged the album's release, failed to adequately promote "The Storm," and then

terminated most of Category 5's employees prior to the release to the radio market of Tritt's second single from "The Storm."

38. All of these steps, and others, were in violation of the representations that Termini had made to Tritt to induce him to sign the Agreement with Category 5, and were disastrous to the success of the initial release of "The Storm" and the release of its second single – which Termini had described as a *"fastball down the middle"* – in the public music market.

39. As a direct result of Termini's mishandling of the release and promotion of "The Storm," the songs from the album failed to appear on public radio play chart tracking. Category 5 undertook no or limited effort to promote any singles or music from "The Storm," and, as a result, album sales and Tritt's reputation suffered.

40. After paying for some costs related to the promotion of the album as required under the Agreement, Termini unilaterally terminated further marketing and promotional costs on or about August 2007 without notice or reason offered to Tritt.

41. Termini refused to pay for contemplated travel costs for radio promotion shows in various cities. Consequently, Tritt was left in the unavoidable position of paying for the costs related to the promotional trips to honor his appearance obligations.

42. Tritt agreed to personally pay such costs in order to avoid irreparable damage to his career in particular major market areas due to inevitable loss of radio air time for the album.

43. Through December 11, 2007, Tritt incurred $307,465.18 in marketing and promotional expenses to which he is entitled to reimbursement under the Agreement, plus interest.

44. The relationship further deteriorated when Termini caused Category 5 to fail to pay Tritt pursuant to the Agreement for royalties due on November 21, 2007. Based on

sales of "The Storm" at the time, of approximately 76,734 units, Tritt is owed over $191,835.00, with an additional amount of $308,165 due through February 21, 2008, plus interest.

45. By letter dated November 16, 2007, Tritt's representative notified Category 5 that Category 5 breached the Agreement for not making appropriate reimbursements.

46. Tritt also informed Category 5 that royalties due on November 21, 2007 were expected to be timely remitted.

47. Despite numerous demands thereafter for payment and for assurances that payment was forthcoming, Category 5 refused to reimburse Tritt for his promotional expenses incurred on its behalf or make the royalty payment as required under the Agreement.

48. As of January 1, 2011, Category 5 owes but has not paid approximately $750,000 (plus interest).

49. On or about December 2007, Category 5 laid off and/or terminated its entire promotion staff on the eve of an anticipated release of Tritt's second single from the album known as "Something Stronger Than Me," further harming sales of "The Storm."

50. In or about December 2007, Category 5 ceased operations.

51. Termini has directly threatened to harm Tritt's future career by making disparaging remarks about Tritt to other record labels that Tritt might want to sign a recording agreement with in the future.

52. Because of Defendants' failure to support, promote and advertise "The Storm" as required under the Agreement, "The Storm" was not a commercial success.

53. Tritt learned from news articles published nationally in November 2007 that the Connecticut State Attorney General was investigating Haven Healthcare, a Connecticut company that operates nursing homes. At the time, Termini was the CEO and founder of Haven Healthcare.

54. Haven Healthcare filed for bankruptcy in November 2007 amid accusations it misused millions of dollars in federal money. The Connecticut Attorney General investigated whether the company illegally used Medicare and Medicaid money for business ventures, including payments to Category 5.

55. The investigation involved the federal Health Care Fraud Task Force, including agents from the Federal Bureau of Investigation; U.S. Department of Health and Human Services, Office of Inspector General; Internal Revenue Service – Criminal Investigation; U.S. Department of Housing and Urban Development, Office of Inspector General; U.S. Department of Veterans Affairs, Office of Inspector General; and the U.S. Department of Labor's Office of Inspector General and Employee Benefits Security Administration.

56. Tritt was not aware that Haven Healthcare had invested in or otherwise had any relationship with Category 5 until the published news reports, nor was Tritt aware of the source of the funds Termini used to capitalize and operate Category 5.

57. On April 20, 2010, Termini was sentenced to one year and one day in prison by Stefan R. Underhill, a federal judge in Connecticut, for stealing millions of dollars to start Category 5 as well as buy a lake house in Connecticut and purchase real estate in his wife's name.

58. Termini pleaded guilty to defrauding Haven Healthcare's landlord, Maryland-based Omega Healthcare Investors, by diverting $956,000 that was intended to pay for new sprinkler systems at nursing homes; and obtaining a $6 million loan from Maryland-based Allied Capital that was intended to improve Haven Healthcare's debt, but was instead diverted to buy real estate.

59. News reports indicate that Termini was ordered to pay a $6,000 fine and forfeit $500,000 to the government. His prison sentence will be followed by three years of supervised release.

### FIRST CAUSE OF ACTION
### (Breach of Contract and Implied Covenant of
### Good Faith and Fair Dealing against Category 5)

60. Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 59 and incorporates them herein by reference.

61. The Agreement between Tritt and Category 5 is valid, binding and enforceable.

62. Tritt has at all times performed his obligations under the Agreement, and Defendants have never challenged whether Tritt performed his obligations under the Agreement.

63. Pursuant to the terms of the Agreement, Category 5 is contractually obligated to make certain payments to Tritt.

64. Category 5 failed to make payments in the amounts and at the times provided for in the Agreement and, therefore, is in breach of the Agreement.

65. Tritt is entitled to judgment against Category 5 for the entire unpaid balance owing under the Agreement, after the application of all allowable credits and offsets, as of the date of this Complaint, in excess of $750,000.

66. Category 5's failure and refusal to make these payments and provide adequate assurances that future payments owed would be timely made, constitutes violation of the covenant of good faith and fair dealing implicit in the Agreement under New York law.

67. Based on the scheme perpetrated by the Defendants, their failure to provide adequate assurances, and the circumstances surrounding their current and future

financial situation, any notice requirements under the Agreement are void or should be deemed satisfied, or, at the very least, subject to reformation.

68. As a direct and proximate result of the breaches of the Agreement by Category 5, Tritt has been damaged in excess of $750,000.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement to Contract against Defendants)

69. Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 68 and incorporates them herein by reference

70. Termini personally and on behalf of Category 5 made affirmative misrepresentations of material fact to Tritt, representing that Category 5 was competent, financially sound, backed by Termini's personal wealth, and would be fully and competently staffed to operate a record label and use reasonable efforts to advertise and promote Tritt's album and singles to radio, retail outlets, and others.

71. Termini's representations to Tritt were materially false when made, and Termini acted intentionally, recklessly, willfully and/or maliciously in making such representations. Termini knew or should have known that these representations were inaccurate and false and that Tritt would rely reasonably on the representations to his detriment.

72. Tritt justifiably and reasonably relied on Termini's representations in entering into the Agreement.

73. Tritt has suffered damages and injury as a direct and proximate result of his reliance on the false and misleading information provided by Termini in an amount to be determined at trial.

74. As a consequence of this illegal inducement, the Agreement is now, and at all times mentioned herein, null and void and should be cancelled and set aside.

## THIRD CAUSE OF ACTION
### (Intentional Interference with Business Relationships against Termini)

75. Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 74 and incorporates them herein by reference.

76. Termini was aware of Tritt's existing business and contractual relationship with Category 5.

77. Termini intentionally and maliciously interfered with Tritt's business relationship with Category 5 by making and threatening to make false, derogatory, disparaging and/or defamatory statements about Tritt and his management, refusing to deal with Tritt's appointed representatives, and directing employees at Category 5 to take actions detrimental to Tritt's career and Agreement with Category 5.

78. As a direct and proximate result of Termini's tortious interference with Tritt's business relations, Tritt is entitled to compensatory and punitive damages in the amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Fraud Against Termini)

79. Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 78 and incorporates them herein by reference.

80. At some point after the parties entered into the Agreement, Category 5 and Termini stopped performing in conformance with their plan to dupe Tritt into the Agreement in order to sign other artists.

81. Termini's goal was to sign Tritt, affording Category 5 the immediate imprimatur of success and stability, and then to use Tritt's signing to recruit other artists such as Sammy Kershaw and George Jones.

82. Such conduct by Termini was an act of fraud in that Termini never had the intent or means to deliver upon the contractual obligations in the Agreement, but promised Tritt and his representatives that he would only sign Tritt and no other artist absent Tritt's consent, building a label around Tritt.

83. Termini had the intention to defraud Tritt by signing him to an exclusive record deal, promising Tritt input and creative control over his records, but Termini never had the intention to allow Tritt such creative control, and never had the intention or means to publicize, promote, market, or fund a staff to handle the recording and launch of a Tritt album.

84. At all times, Termini intended to defraud Tritt by making false representations about Termini and Category 5's ability to launch, build, market, and handle Tritt as an artist and record releases by Tritt; to the contrary, Termini never had the means by which to support the Category 5 obligations under the Agreement.

85. Termini used converted funds from Haven Healthcare to support Category 5, unknown to Tritt or his management team, and Category 5 was formed and supported by converted and misappropriated funds.

86. Termini never disclosed his scheme to Tritt or Tritt's representatives, and manufactured false claims about his wealth and the source of funds to support Category 5, all in an effort to dupe Tritt into signing with Category 5.

87. Termini had the motive (signing other artists after Tritt despite Termini's promises to the contrary); intent (desire to dupe Tritt into signing with Category 5); and means (funding Category 5 through funds diverted from Haven Healthcare) to defraud Tritt.

88. Termini made material misrepresentations to Tritt and his representatives, including that Tritt was important to the success of Category 5 and that an independent record label would be developed around Tritt.

89. Tritt reasonably relied on such representations to his detriment.

90. As a result of Termini's fraud, Tritt has suffered damages to his name and reputation, including harm suffered due to Termini's failure to fund and arrange for the promotion of Tritt and his music.

91. Tritt also has suffered significant harm because Category 5 failed to adequately and properly promote Tritt and "The Storm" album, failing to (i) arrange for adequate radio play; (ii) arrange for personal appearances and appearances aimed at promoting Tritt's music; (iii) develop a plan to adequately market and promote "The Storm" and its singles; and (iv) take other steps common to a record label to build the name, reputation, and brand of an established music artist, including sales of records.

92. Tritt suffered a loss of sales of "The Storm" and singles from the album. Because Category 5 did not adequately expose Tritt and "The Storm," and failed to adequately promote Tritt's music and the artist himself, Tritt suffered from lost album sales and lost future earnings because of the commercial disappointing sales of "The Storm."

93. Tritt has therefore been damaged in the amount of not less than $5,000,000 due to Termini's fraud, and is entitled to punitive damages as a result of Termini's fraud and also to deter Termini from engaging in future fraudulent conduct in an amount not less than three times the compensatory damages suffered by Tritt.

### FIFTH CAUSE OF ACTION
### (Unjust Enrichment Against Termini)

94. Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 93 and incorporates them herein by reference

95. Tritt is entitled to relief under the theory of unjust enrichment, that is, by failing to make the payments promised and owed to Tritt, Termini has been unjustly enriched at the expense of Tritt.

96. Termini has conferred upon himself a benefit, assuming unauthorized dominion and control over the payments owed to Tritt as per the Agreement.

97. Termini has exercised unauthorized control over the money (reimbursement and royalty fees) owed to Tritt. At the expense of Tritt, Termini benefitted from not paying such contractual fees and expenses to Tritt as required under the Agreement.

98. Equity and good conscience require Termini to remit to Tritt the amount of $5,000,000.

**WHEREFORE,** Tritt demands that a judgment be entered against Category 5 and Termini:

(A) for the first cause of action designated "Breach of Contract and Implied Covenant of Good Faith and Fair Dealing" against Category 5 in an amount not less than $750,000, plus the attorneys' fees, interest, costs, and expenses of this action;

(B) for the second cause of action designated "Fraudulent Inducement to Contract" against Termini and Category 5 in an amount not less than $750,000 to be determined at trial, plus a declaration from the Court that the Agreement is null and void;

(C) for the third cause of action designated "Intentional Interference With Business Relationships" against Termini in an amount not less than $750,000 to be determined at trial, plus the attorneys' fees, interest, costs, and expenses of this action;

   (D) for the fourth cause of action designated "Fraud" against Termini in an amount not less than $5,000,000, plus the attorneys' fees, interest, costs, and expenses of this action;

   (1) for punitive damages in an amount not less than $5,000,000 or an amount sufficient to deter Termini from such future wrongdoing, as determined in the discretion of the trier of fact on the evidence produced at trial, given the relative circumstances and financial positions of the parties and the degree of malice shown by the conduct of Termini; and

   (E) for the fifth cause of action designated "Unjust Enrichment" against Termini in an amount not less than $5,000,000, plus the attorneys' fees, interest, costs, and expenses of this action.

Dated: New York, New York
   January 31, 2011

              WUERSCH & GERING LLP

              By: Samuel D. Levy (SDL9271)
                Peter C. Noyes (PCN1582)
              Counsel for Plaintiff TRAVIS TRITT
              100 Wall Street, 21st Floor
              New York, New York 10005
              212-509-5050

1

AGREEMENT made as of the 24 day of December, 2005 by and between CATEGORY 5 RECORDS, LLC, of 245 Longhill Road, Middletown, Connecticut 06457 ("Company") –and – TRAVIS TRITT, c/o Friedman and LaRosa, of 1344 Lexington Avenue, New York, New York 10128 ("you" or "Artist"). The following shall constitute the agreement between the parties hereto whereby you will furnish your exclusive personal services to Company as a recording and performing artist for the "Territory" (as defined below) and whereby you will grant to Company the exclusive right, for the Territory, to the results and proceeds of your services as a recording artist. All references herein to "you", "Artist", "you and the Artist" or the like shall be understood to refer solely to you.

1.  Territory: Universe.

2.  Masters: You will furnish your exclusive services to Company as a recording and performing artist during the Term (as defined below) for the purpose of recording audio-only and audiovisual master recordings hereunder (collectively, "Masters"). You will cause the Masters to be produced and you will deliver them to Company as provided in this agreement.

3.  Product/Term:
    (a) The term hereof (the "Term") shall consist of an initial period (the "First Contract Period") plus the additional "Contract Periods", if any, by which such Term may be extended by Company's exercise of one or more of the options granted to Company below. You hereby irrevocably grant to Company three (3) separate consecutive options to extend the Term for a Second, Third and Fourth Contract Period, respectively. Company may exercise each Contract Period option by giving you notice not later than the expiration of the Contract Period then in effect (the "Current Contract Period"). Notwithstanding anything to the contrary herein, if Company has not exercised its option to extend the Term for a further Contract Period as of the date on which the Current Contract Period would otherwise expire, the following shall apply: (i) you shall send Company notice (the "Option Warning") that its option has not yet been exercised; (ii) Company shall have the right to exercise the applicable Contract Period option by sending notice to you not later than thirty (30) days after its receipt of the Option Warning (the "Extension Period "); (iii) the current Contract Period shall end on either the last day of the Extension Period or the date of Company's notice (the "Termination Notice") to you that Company does not wish to exercise such option, whichever is sooner; (iv) for the avoidance of doubt, nothing herein shall limit Company's right to send a Termination Notice to you at any time nor limit Company's right to exercise a Contract Period option in accordance herewith, not withstanding any failure by you to send Company an Option Warning in accordance herewith.

    (b) During the First Contract Period, and any subsequent Contract Periods, you shall furnish Artist's services to Company hereunder, in connection with recording and delivering Masters sufficient to constitute one (1) album which shall be deemed the "Minimum Recording Commitment" for each of the applicable Contract Periods. Such albums are sometimes referred to herein as the "First Album", the "Second Album", the "Third Album" and the "Fourth Album". All Masters recorded in fulfillment of your Minimum Recording Commitment shall embody newly-recorded studio performances of Artist and shall be subject to the approval of Company as technically and commercially satisfactory for the manufacture and sale of phonograph records. Those albums delivered in fulfillment of your Minimum Recording Commitment shall be no less than forty (40) minutes in playing time.

(c) The First Contract Period shall commence on the date hereof and shall continue until the last day of the twelfth full month following the month in which the last Masters constituting your Minimum Recording Commitment for such Contract Period have been delivered to and accepted by Company. Each subsequent Contract Period shall commence on the date following the day of expiration of the immediately preceding Contract Period and shall continue until the last day of the twelfth full month following the month in which the last Masters constituting your Minimum Recording Commitment for such Contract Period have been delivered to and accepted by Company. You shall deliver the album constituting your Minimum Recording Commitment for First Contract Period hereunder not later than July 31, 2007 and the first single therefrom shall be delivered not later than May 30, 2007; the actual release dates of the aforesaid single and album, if any, shall be at Company's sole discretion. You shall deliver the album constituting your Minimum Recording Commitment for each subsequent Contract Period within the first three (3) months after the commencement of each such respective Contract Period, provided however, notwithstanding the forgoing, you shall not be required to deliver any such album sooner than eighteen (18) months following the delivery of the immediately preceding album delivered in satisfaction of your Minimum Recording Commitment.

4. Recording Process:

(a) Each of the following elements shall be mutually determined by you and Company in each instance prior to the commencement of recording: (i) the material to be recorded (including the number of selections to be recorded), (ii) the dates of recording and the studio where recording is to take place, (iii) the producer of the Masters (to be engaged by Company in any event), and (iv) the budget for the recording of such Masters (including, without limitation, all producer Advances and fees). In the event of a dispute regarding any of the foregoing matters, Artist's decision shall be final, provided such decision is reasonable, is made in good faith and is consistent with the goal of maximizing record sales. Notwithstanding Artist's right of final approval as aforesaid, Artist may not require:

(i) a producer to be engaged hereunder whose royalty is in excess of 6% (or the retail equivalent, if a retail equivalent base is used hereunder) of the royalty base price in respect of USNRC Net Sales (as such term is defined below) of records (with proportionate reductions for other sales and uses), or a producer Advance in excess of Five Thousand ($5,000.00) Dollars per Master; or

(ii) a recording budget in excess of Three Hundred Fifty Thousand ($350,000) Dollars in respect of the First Album, and Three Hundred Thousand ($300,000) Dollars in respect of each of the Second, Third and Fourth album(s).

(b) Company will pay all specifically approved recording costs (including, but not limited to, paying for studio time by issuing so-called "PO's") in connection with the Masters; all such recording costs shall be recoupable from royalties payable hereunder. You shall not incur any recording costs without Company's prior written approval.

(c) Nothing contained in this agreement shall obligate Company to permit the continuation of any recording session to be held hereunder, if Company anticipates that the